436 So.2d 522 (1983)
STATE of Louisiana
v.
Audrey E. MASSEY, Jr.
No. 82-KA-1228.
Supreme Court of Louisiana.
June 27, 1983.
Rehearing Denied September 1, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John F. Rowley, Dist. Atty., Glen Diaz, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Manuel Fernandez, Daniel Dysart, Law Offices of Manuel Fernandez, Chalmette, for defendant-appellant.
MARCUS, Justice.
Audrey E. Massey, Jr. was indicted by the grand jury for first degree murder in violation of La.R.S. 14:30. The indictment was subsequently amended to charge defendant with second degree murder in violation of La.R.S. 14:30.1. Defendant entered a plea of not guilty and not guilty by reason of insanity. After a trial by jury, defendant was found guilty as charged and sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, defendant relies on three assignments of error for reversal of his conviction and sentence.[1]

ASSIGNMENT OF ERROR NO. 1
Defendant contends the state failed to prove specific criminal intent, an essential element of the crime of second degree murder. *523 He argues that his intoxication precluded the presence of such an intent.
Our review of the record reveals the following facts. On January 17, 1980, defendant, a maintenance employee at Tenneco Oil Refinery in St. Bernard Parish, left his home at about 7:30 a.m. At this time, the union was on strike at Tenneco and defendant, a union member, went to the refinery and walked the picket line from 8:00 a.m. until 12:00 noon. Thereafter, defendant went to Chick's, a local bar, where he drank several beers until 4:00 p.m. He left and went to Vic's Bar where he was joined by Gregory Green. At 10:00 p.m., he and Mr. Green proceeded to Sal's Bar where defendant played pool and drank beer until it closed at 1:30 a.m. and then to Q.C.'s Bar until it closed at 2:30 a.m. They then went to Lehmann's Bar and stayed until they parted company at about 3:30 or 3:45 a.m. At this time, defendant called his wife to pick him up as he had lost the keys to his truck.
Mrs. Massey drove to Lehmann's, picked defendant up and took him home. At their house, defendant watched television with his wife. He discussed the situation in Iran, the failure of his children to do the tasks he had asked them to do and the strike situation at Tenneco. His wife fixed him eight eggs for breakfast which he ate. About 7:00 a.m., Mrs. Massey attempted to help defendant up the stairs to their bedroom. He pushed her aside, went into a small room where he kept his hunting and fishing equipment and removed a .12 gauge shotgun and a 30-30 deer rifle which he put in the front seat of his wife's car. He asked his wife to drive him to Lehmann's Bar so he could pick up his truck. She became alarmed and told their seventeen-year-oldson to call Hector Hernandez, a close personal friend, and then tried to stall her husband until Hernandez could arrive. Defendant's son called Hernandez and told him: "My mama wanted you to come over right away. My dad is going to shoot up Tenneco." Shortly thereafter, they left the house. As they were driving, Mrs. Massey saw Hernandez pass and turned to go back to their home. Defendant told her to pull off the road. When she came to a stop, he grabbed the wheel, pushed her out of the car and drove off.
About 7:30 a.m., defendant arrived at Tenneco and turned down Paris Road which leads to a contractor's gate to the refinery. The gate was being manned by Jill Tagliavore and Jerry Singletary. As defendant approached the gate, he pulled slightly off the shoulder of the road, as if to enter, but was flagged on by Singletary. He went by the gate and headed toward the river. When he reached the end of the road, he turned around and returned to the gate area. He went by the gate about thirty yards and then made a big "hoop" in the highway across Paris Road. He drove off of the road onto a shell area in front of an Exxon gate fifteen or twenty yards directly across from where Singletary and Tagliavore were standing. Defendant was driving in a completely normal manner. Tenneco maintained a camera which panned the entire area and recorded defendant's maneuvers. He was neither zig-zagging nor did he cross the center line during this time.
Defendant sat in his car and a "minute or two" later Mr. John "Bud" Hurst, supervisor of the Tenneco maintenance department, arrived in a red company pickup truck. Hurst drove past defendant, made a similar "hoop" turn and parked his truck in the gate area parallel to defendant's car. Mr. Hurst got a cup of coffee and standing between Singletary and Tagliavore began to talk to them. Two or three minutes later, Hernandez arrived. He had spotted defendant's car from the main road, St. Bernard Highway, turned onto Paris Road and approached the gate area where defendant's car was parked. As he did so, he saw defendant "wrestling" with the deer rifle which was now in the back seat of the car and tangled in the seat belt. Hernandez pulled his truck in front of defendant's car in an effort to block him. Hernandez got out of his truck and approached defendant's vehicle. Defendant began to slowly move his car ten or twelve feet backward and then forward as Hernandez attempted to approach the car. Defendant then threw *524 his car in reverse throwing shells and dust on Hernandez. When he stopped, both Hernandez and Singletary saw the rifle come out of the window on the passenger's side of the car. Singletary at first thought it was a camera aimed directly at them until he recognized that it was a rifle. Defendant, who was a "very good" shot, fired once and hit Bud Hurst. The bullet entered "his body behind the right shoulder" and went "through an aorta which is the major blood vessel leaving the heart." Hurst died instantly. Hernandez ran to the driver's side of defendant's car and grabbed the rifle but another shot went off hitting the company pickup truck. Hernandez took the guns away from defendant and went to see if he could help the victim. Defendant drove off.
The police were summoned and at 7:55 a.m., only minutes after the shooting, they arrived at defendant's home. They told one of defendant's children to tell him to come out of his house with his hands on his head. Defendant exited the house as told. He was advised of his rights and placed under arrest at 7:59 a.m. Although the officers noticed a smell of alcohol about defendant, they did not think he was intoxicated. He appeared to be coherent and responded to all orders and instructions. He was not mumbling, stuttering or stumbling. He was taken to the sheriff's office where he was again advised of his constitutional rights. Defendant was also asked several questions including his age and the number of years he had completed in school. Defendant answered these questions and others without hesitation. He responded that he understood his rights and signed a waiver of rights form at 8:16 a.m. The officers also filled out an arrest form in which they indicated that defendant "had been drinking" as opposed to being intoxicated.
At trial, several persons testified as defense witnesses who had been with defendant on the day before and/or the early morning hours the day the shooting took place. Although all of these persons testified that defendant was a "heavy drinker," only one of these individuals could testify as to the amount of beer defendant had consumed on the night and morning before the shooting. Mr. Green, who had been with defendant from 4:00 p.m. on the 17th until 3:30 a.m. on the 18th, testified that he and defendant drank 30 beers. However, on cross-examination, he testified that he was not sure how many beers defendant drank and that he had left defendant for one or two hours to play cards while they were at Sal's. He further admitted that he was not qualified to give an opinion on defendant's state of intoxication since he too had been drinking. Sal Cusimano, the owner and operator of Sal's and Q.C.'s bars and defendant's former fellow worker and friend of fifteen years, testified that defendant had been drinking beer and shooting pool in Sal's and was not drunk when it closed at 1:30 a.m. However, he further testified that defendant and his companions went to his other establishment, Q.C.'s, where they continued to shoot pool and at 2:30 a.m. when this bar closed, defendant was drunk. Mr. Ralph Bourg, defendant's friend of twenty-three years, testified that he saw defendant from the door of Lehmann's Bar at 4:30 a.m. and defendant appeared to be drunk. However, this testimony is in conflict with that of Mrs. Massey, who testified that she picked defendant up at 3:30 or 3:45 a.m. Mrs. Massey testified that when she picked defendant up at Lehmann's, he appeared to be very intoxicated. However, she further testified that defendant had nothing further to drink during the time that he was home. She also stated that when defendant returned from Tenneco, he was "walking a lot better than he had been walking before."
In addition to the above, defendant also presented the testimony of two psychiatrists, Dr. Kenneth Ritter and Dr. J. Robert Barnes. Both of these doctors concluded that defendant was not legally insane at the time of the commission of the crime but it was possible that defendant had suffered from an alcohol blackout. However, on cross examination, Dr. Barnes, when asked if defendant knew what would happen when he pulled the trigger on a loaded gun at the time of the shooting, replied: "I have *525 to presume that he did. There is no evidence to the case that he didn't. He was a hunter. He knows what to do with a gun. He was a successful hunter. He knows how to handle them. He knows what happens when he uses them." Dr. Ritter also stated that defendant "had an intent at the time to harm someone."
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Although intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction. La.R.S. 15:445; State v. Noble, 425 So.2d 734 (La.1983). Voluntary intoxication is a defense to a prosecution for second degree murder only where the circumstances indicate that it has precluded the presence of specific criminal intent. La.R.S. 14:15(2). On review of the sufficiency of the evidence to support a criminal conviction, it must be determined whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Noble, 425 So.2d 734 (La.1983).
In the instant case, the circumstances do not indicate that defendant's intoxication precluded the presence of specific criminal intent required in second degree murder. Although the testimony indicated that defendant had been drinking for a long period of time, there was no testimony as to the exact amount of beer he had consumed. In addition, defendant had nothing to drink for at least three and one-half hours prior to the shooting and had eaten a large breakfast during this period. He was able to drive in a normal manner to the refinery, park his vehicle, aim his rifle and shoot the victim through the heart at a distance of thirty yards. The police testified that defendant was not intoxicated at the time of his arrest, only minutes after the shooting took place, and that he was coherent and responded to all orders and instructions. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have determined that defendant had the specific intent to kill or inflict great bodily harm.
Assignment of Error No. 1 is without merit.
We find that neither of the remaining assignments of error present reversible error, nor do they involve legal issues not governed by clearly established principles of law. They will be treated in an appendix which will not be published but which will comprise part of the record in this case.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
NOTES
[1] Defendant designated six errors to be urged on appeal in his assignment of errors filed in the district court. However, he expressly abandoned Assignments of Error Nos. 2 and 3 in his brief to this court. During oral argument, he abandoned Assignment of Error No. 5.