535 So.2d 1135 (1988)
STATE of Louisiana, Appellee,
v.
Curtis Lee MASSEY, Appellant.
No. 20052-KA.
Court of Appeal of Louisiana, Second Circuit.
November 30, 1988.
*1136 Wilson Rambo, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., James A. Norris, Jr., Dist. Atty., Joseph T. Mickel, Peggy Sullivan, Asst. Dist. Attys., for appellee.
*1137 Before JASPER E. JONES, SEXTON and NORRIS, JJ.
NORRIS, Judge.
The defendant, Curtis Lee Massey Jr., was indicted for second degree murder, LSA-R.S. 14:30.1, arising from the February 1987 stabbing death of his former girlfriend, LaSandra Johnson. On the day after the stabbing Massey was arrested and taken into custody; he gave an inculpatory recorded statement. In May 1987 the trial judge denied his motion to suppress. At trial in October 1987 a jury found Massey guilty as charged and the court ultimately imposed the mandatory life sentence at hard labor without benefit of probation, parole or suspension of sentence. Massey now appeals, urging that the ruling on the motion to suppress was incorrect and that the evidence adduced at trial was insufficient to sustain the conviction. For the reasons expressed, we affirm.

Facts
Around 4:30 in the morning of February 10, the police received a call to the victim's house on Gaston St. in Monroe. LaSandra Johnson lived there in her mother's house with her three small children, her brother and her mother. LaSandra's mother or brother had heard a noise in her bedroom, entered and discovered LaSandra lying bloody and mutilated on her bed. Her six-month old son, Bruce, lay next to her, unharmed. By the time the police arrived, she appeared to have expired; when the coroner came, he confirmed it. An autopsy later showed that she had died from massive blood loss resulting from nine stab wounds.
Investigating the scene, police discovered that someone had cut a screen over a window in the house's back door, pried open the window, unlocked the door and entered the house.
At the hearing on the motion to suppress, the following details about the investigation were adduced. Capt. Smith testified that LaSandra's brother, Cornell Johnson, came in and claimed to know that the assailant was Massey, because Massey had been harassing LaSandra with threatening phone calls. LaSandra had even asked Cornell to make sure the doors and windows were locked that night. Cornell told the officers where Massey lived. LaSandra's mother, Mrs. Earnestine Johnson, verified that Massey had been placing threatening phone calls. She added that LaSandra and Massey had lived together in the past and Massey was the father of Antron, LaSandra's second child, but the pair's relationship had been stormy. Massey had threatened her on several occasions, injured her and spent time in jail for these incidents. Mrs. Johnson stated that Massey was not welcome in her home.
Police were dispatched to the Polk St. address that Cornell Johnson provided. Massey's mother, Mrs. Massey, told Cpl. Harris that he was not at home; she had driven him to a lounge on Renwick St. the previous evening and had not seen him since. She referred the officer, however, to an apartment on Elm St. where Massey's brother, Andrew Tolliver, lived with his girlfriend, Phyllis Holmes.
Police went to the Elm St. apartment and were met by Ms. Holmes. She told the officers that Massey was not there, having stopped by earlier but left; she nevertheless consented to a search of the apartment. Officer Biggars entered the bedroom and found Massey, fully dressed, seated on a couch. Tolliver was in the bed. The police took Massey to the living room for questioning and read him his Miranda rights. Massey was not physically restrained but he was not free to leave. The officers attempted to learn from him what he had done with a particular sweater that, according to Mrs. Massey, he had been wearing that night. Massey said he remembered taking it off and placing it on the sofa, but did not know what happened to it afterwards. With Ms. Holmes's permission, officers searched the apartment. They did not find the sweater but they did uncover, in the bathroom, a towel that appeared to have red stains on it. They seized the towel. Massey agreed to accompany the officers to the police station for questioning.
*1138 Massey came to the station and was asked if he would consent to a polygraph test. He agreed and went with the officers to the polygraph facility but changed his mind and refused to take the test. He was returned to the police station and questioned further. He gave a statement that denied any involvement in the stabbing. Feeling they had insufficient evidence to get a conviction, the police released Massey on the afternoon of February 10, 1987.
The next evening, February 11, an anonymous person identifying himself only as a "relative" went to the police with information that he had overheard a conversation between Massey and his mother, Peggy Massey. On this basis he understood Mrs. Massey and one of Massey's brothers would be returning to the Elm St. apartment to discard the sweater he was suspected of wearing and the knife he was suspected of using. The informant advised police to return to the apartment as soon as possible. Capt. Smith testified he recognized the informant from a prior case but did not know him well and could not identify him.
Capt. Smith and Sgt. Pickens went to the apartment and, on first arrival, found no one home. They returned to the apartment around 9:30 p.m., reinforced by Detectives Peel and Stewart, to find Ms. Holmes and two other women present. They admitted the officers. Ms. Holmes told the police the sweater was under a couch cushion. Detective Peel looked, found and seized the sweater. It was damp, as though someone had tried to wash it. A few moments later, Andrew Tolliver appeared and handed officers a butterfly-style knife that he found on top of the refrigerator after Massey left the apartment. Mrs. Massey verified it was Massey's knife. The officers told them they would find Massey and arrest him for first degree murder. Mrs. Massey told them Massey was at her house on Polk St.; she led them there. She went inside the house and brought Massey to the front porch, where he surrendered peacefully.
Massey was taken to the station, advised of his Miranda rights and interrogated. He gave a recorded statement in which he stated he had telephoned LaSandra from his brother's apartment and that she had refused to interrupt a phone call with someone else. He admitted going to Gaston St., cutting the screen and entering the house, going to LaSandra's bedroom, and asking her whom she was talking to when she refused to take his call. According to the statement, they talked a few minutes and then she asked him to leave; at trial, he added that she taunted him. Massey admitted he then began stabbing her; afterwards he returned to Tolliver's Elm St. apartment. As noted, the autopsy showed that the victim died from massive blood loss resulting from nine stab wounds, at least two of which could have been fatal. One of the fatal wounds was so forcefully inflicted that it broke the victim's ninth rib. One wound to the left forearm indicated the victim had made a pathetic attempt to defend herself from the attack. Three wounds were in the victim's back.
Massey was indicted for second degree murder. Before trial he moved to suppress all evidence gathered from the investigation, urging that his arrest had been unsupported by probable cause and his confession was involuntary. The district court conducted a hearing at which the details of the investigation related above were adduced. At this hearing, Massey testified that he confessed only because the police threatened to arrest and jail his brother and Phyllis Holmes for helping him conceal evidence, and to leave them alone if Massey told what happened. There was no mention of this, however, in the recorded confession. The court denied the motion, refusing to suppress any of the evidence. At trial the state did not reiterate the investigative details but relied on the taped confession. The state introduced the knife into evidence but not the sweater or the towel, which were found not to have bloodstains. Massey waived his fifth amendment rights and took the stand, admitting all the pertinent points in his confession. He added that LaSandra taunted him that night by pulling down her panties, squeezing one of her buttocks and saying, "Look at these cheeks." He insisted he "didn't know why" he stabbed her, except perhaps *1139 to clear his memory of catching her in bed with another man some five months earlier; he related this encounter. The jury found Massey guilty as charged and the court imposed the mandatory sentence.

Probable Cause
By his first assignment Massey urges the trial court erred in ruling that his statements were admissible and in further ruling that probable cause existed for his arrest. A peace officer may, without a warrant, arrest a person when the officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer. LSA-C.Cr.P. art. 213. Reasonable cause has been judicially recognized as equivalent to probable cause. State v. Weinberg, 364 So.2d 964 (La.1978). Reasonable cause exists when the facts and circumstances known to the arresting officer and about which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. State v. Johnson, 422 So.2d 1125 (La.1982); State v. Hathaway, 411 So.2d 1074 (La.1982). Mere suspicion cannot justify an arrest. State v. Randolph, 337 So.2d 498 (La.1976). However, an arrest may be supported by less evidence than would justify a conviction. State v. Billiot, 370 So.2d 539 (La.1979), cert. denied 444 U.S. 935, 100 S.Ct. 284, 62 L.Ed.2d 194 (1979); State v. Scott, 389 So.2d 1285 (La.1980). Probable cause to arrest is not absolute cause and, to determine its existence, courts must examine facts and circumstances within the arresting officer's knowledge in light of the training and experience of reasonable people, not legal technicians. State v. Weinberg, supra. The determination of whether an officer had reasonable cause to make a warrantless arrest is in the first instance a matter for the trial judge, as it depends on factual determinations and the credibility of witnesses. State v. Billiot, supra; State v. Barge, 444 So.2d 735 (La.App. 5th Cir.1984), writ denied 446 So.2d 1229 (La. 1984).
Before the police detained Massey for questioning in the Elm St. apartment on February 10, they had the following facts within their knowledge:
(1) LaSandra Johnson had been stabbed to death in her own bedroom a short while earlier.
(2) Entry into the house had been forcible.
(3) The victim's brother and mother immediately suspected Massey as the perpetrator, on the basis of these facts:
(a) The victim and Massey had previously lived together and had a child, but were no longer living together.
(b) The relationship had been tumultuous and violent.
(c) Massey had battered the victim before and had spent time in jail as a result of their altercations.
(d) Massey had been threatening the victim in the time just prior to the attack.
(e) On the evening before the attack, the victim asked her brother to secure the house against intruders because she feared Massey's conduct.
(4) The victim's brother provided reliable information as to Massey's whereabouts.
(5) When the police found Massey at 5:00 a.m., he was fully dressed, wide awake and sitting on a couch in the bedroom with his brother.
These facts are concededly insufficient to support a conviction but are more than adequate to show reasonable cause to arrest. They clearly place suspicion on the defendant. The only possible flaw in the showing is that the informants, Cornell and Earnestine Johnson, were not eyewitnesses to the attack, and they may have harbored some animosity toward Massey for his prior dealings with the victim. However, the trial judge found their information credible and we detect no basis for disturbing this finding. We note that their information was not merely speculative but based on explicit facts. See State v. Wilson, 366 So.2d 1328 (La.1978). We also note that they offered their information spontaneously, *1140 without chance for fabrication. These factors support the judge's determination that Cornell and Earnestine's statements were truthful. We do not find error in the trial court's ruling.
Even assuming arguendo that the February 10 detainment was illegal, it would have had no bearing on the outcome of the case. Defense counsel conceded that the search conducted pursuant to that detainment was fruitless. R. p. 253. While in custody on February 10, Massey gave no incriminating statement. The state relied on no items of physical evidence seized as a result of the detainment. Thus there were no "fruits" to be suppressed. Massey further argues, however, that the February 11 arrest was a continuation of the initial detainment and that the confession obtained was therefore a "fruit" of the initial illegality. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, the February 11 arrest was attenuated from the first detainment by a number of factors. It occurred over 24 hours after Massey had been released; during this time he had the opportunity to regain his composure, consult with his family, and decide on his plan of action; and most importantly, probable cause was enhanced when the police received an informant's statement and two pieces of critical evidence that very conclusively linked Massey to the crime. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); State v. Taylor, 468 So.2d 617 (La.App. 2d Cir.1985), writ denied 472 So.2d 918 (La.1985). Under these circumstances the alleged illegality of the initial detainment is irrelevant. Any statement Massey made after his arrest on February 11 was free of taint from the allegedly illegal detainment of February 10. However, we conclude the initial detainment was not illegal, and this argument does not present reversible error.

Voluntariness of Confession
By this argument Massey urges the police officers encouraged him to confess to the murder in order to protect his brother and brother's girlfriend from prosecution on charges of concealing or tampering with evidence of a crime. LSA-R.S. 15:451 provides:
§ 451. Condition precedent to use of confession; free and voluntary rule
Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
Before the state can introduce an inculpatory statement made in police custody, it bears the burden of proving beyond a reasonable doubt that defendant received Miranda warnings and that the statement was freely and voluntarily made and not the product of promises, threats or duress. LSA-C.Cr.P. art. 703; State v. Jennings, 367 So.2d 357 (La.1979); State v. Bell, 395 So.2d 805 (La.1981). Once a defendant alleges specific instances of police misconduct in reference to the statement, the state must specifically rebut each such instance. State v. Dison, 396 So.2d 1254 (La.1981); State v. Petterway, 403 So.2d 1157 (La.1981). As a matter of federal constitutional law, a confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); State v. Morvant, 384 So.2d 765 (La.1980).
At the hearing on the motion to suppress, police officers testified that Massey received Miranda warnings at least four times, including twice by a written form. See Ex. S-1, S-2. Massey executed S-2 only an hour before he gave the recorded confession. Every witness testified that Massey was not drunk, insentient or otherwise incapable of understanding his rights. Massey even admitted he understood the forms.
The chief thrust of the argument is that the officers threatened, before taking the statement, to pick up Massey's brother and *1141 brother's girlfriend, Tolliver and Holmes, unless Massey confessed; and assured him, after taking the statement, that there would be no need to "bring his family into this." R. p.p. 228, 230. This claim is, in the first place, not supported by the record evidence; the transcript of Massey's statement contains his denial that any threats or promises were used on him. R. p. 81. The statement contains no mention of Tolliver or Holmes.
Testimony from the hearing, however, reveals that Detectives Peel and Stewart mentioned, while the confession was not being recorded, Tolliver and Holmes's potential involvement. Detective Stewart admitted telling Massey that the sweater had apparently been washed before they seized it, and that his relatives could get in trouble for withholding evidence. He denied telling Massey that if he confessed, there would be no need to pursue Tolliver and Holmes. He finally denied advising Massey to confess in order to protect his relatives. R. p.p. 217-219. Detective Peel told Massey his relatives could "get in trouble" for concealing evidence. R. p. 205. This was admittedly after the recorded statement was completed.
A fair construction of all this testimony, including Massey's, yields the conclusion that the officers were not making threats or promises, but instead were exhorting Massey to tell the what had truly happened. Such an exhortation, without an inducement in the nature of a threat or promise, does not render the confession inadmissible. State v. Mullins, 353 So.2d 243 (La.1977); State v. Hall, 434 So.2d 517 (La.App. 2d Cir.1983), writ denied 440 So.2d 759 (La.1983). In fact, Louisiana courts have repeatedly held that confessions given in response to exhortations to consider the health, well-being and liberty of close relatives are admissible. See State v. Weinberg, supra; State v. Baylis, 388 So.2d 713 (La.1980).
In State v. Brown, 504 So.2d 1025 (La. App. 1st Cir.1987), writ denied 507 So.2d 225 (La.1987), the defendant moved to suppress a confession given in response to the officers' admonishment,
"If you get your business straight, I'll let them [defendant's sister and girlfriend] go, you know, if they hadn't had anything to do with it."
The court reasoned that while the defendant may have felt genuine concern for his sister and girlfriend, an appeal to this concern was not coercive; the defendant was not induced to incriminate himself in order to exculpate the women.
In the instant case Massey unquestionably felt concerned lest Tolliver and Holmes become involved in the case as a result of their own actions. However, their potential criminal liability was merely mentioned factually, to point up an inconsistency in Massey's story and to encourage him to tell the truth. It was not expressed in the manner of a threat or inducement.
Finally, the trial judge's conclusions as to the credibility and weight of testimony bearing on the voluntariness of a confession are entitled to great weight. State v. Rodrigue, 409 So.2d 556 (La.1982); State v. Thibodeaux, 414 So.2d 366 (La.1982). The trial judge obviously felt the officers' rendition of events was more credible and this record provides no basis to undermine the conclusion. We perceive no abuse of discretion. Massey's first assignment does not present reversible error.

Sufficiency of Evidence
By his second assignment Massey claims the evidence is legally insufficient to support the jury's verdict of guilty to second degree murder, but rather supports the lesser verdict of manslaughter. The test for sufficiency of evidence is whether the record evidence, viewed in light most favorable to the prosecution, is sufficient to persuade a rational factfinder that the essential elements of the crime were proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979). Second degree murder and manslaughter are defined as follows:
§ 30.1. Second degree murder
A. Second degree murder is the killing of a human being:

*1142 (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm. * * *
§ 31. Manslaughter
Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm. * * *
The state proved the first essential element of second degree murder, that Massey killed LaSandra Johnson. The second element is specific intent. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. LSA-R.S. 15:445; State v. Kahey, 436 So. 2d 475 (La.1983).
Massey advances two grounds in favor of his argument that the evidence is insufficient to prove specific intent. He first argues that he was incapable of forming specific intent because he was drunk. Intoxication may under the appropriate circumstances preclude the presence of specific criminal intent. LSA-R.S. 14:15(2). However, intoxication is in the nature of an affirmative defense to a criminal charge and the defendant bears the burden of proving its existence at the time of the offense. State v. Gipson, 427 So.2d 1293 (La.App. 2d Cir.1983); State v. Davis, 451 So.2d 1 (La.App. 1st Cir.1984).
The evidence completely undermines Massey's claim of intoxication. Every officer present in the Elm St. apartment on the morning of February 10 testified that Massey did not appear drunk, drugged or impaired in any faculty. According to Massey and Tolliver, they shared a 40-oz. bottle of beer and a half-pint of vodka early in the evening; then Massey drank about ten "little" cups of beer at the beer bust; and then he drank less than half of a half-pint of liquor; all over a three or four hour period. Even by Massey's own testimony, the evening's drinking binge must have ended around midnight, some four hours before the stabbing. This was sufficient time for Massey to walk to Elm St., relax, telephone LaSandra, and presumably experience a diminution of the liquor's effect. Given this state of the evidence, the jury was entitled to disregard Massey's self-serving claim of intoxication. See State v. Hilburn, 512 So.2d 497 (La.App. 1st Cir. 1987), writ denied 515 So.2d 444 (La.1987).
Any doubt as to Massey's inability to form specific intent by the time of the attack must be dispelled by his rather intricate mode of entering the victim's house: cutting a screen in order to open a window in order to reach a door lock in order to open a door to enter the house and go to LaSandra's room noiselessly. This conduct is totally inconsistent with the claim that alcohol numbed his ability to form specific intent. Viewing the evidence in light most favorable to the prosecution, a rational factfinder could have concluded that Massey had the specific intent to kill or inflict great bodily harm. State v. Massey, 436 So.2d 522 (La.1983).
Massey next argues his offense was committed in a sudden passion or heat of blood immediately after the victim taunted him. According to Massey's testimony, LaSandra *1143 asked him to leave; she then pulled down her pants and undergarments, grabbed the back of her leg and said, "Look at these cheeks"; then Massey began to stab her. The only explanation he offered was his obsession with having caught LaSandra at their apartment in bed with a man named Bruce Lighten. By Massey's own admission, however, this incident occurred in September 1986, almost five months before the killing; Bruce Lighten's child, whom LaSandra named Bruce, was six months old at the time of the killing. The child was also in the bed when LaSandra was killed. The only conclusion is that LaSandra's liaison with Bruce Lighten, and Massey's knowledge of it, was several months old by February 10, 1987. It was not the sort of sudden provocation contemplated by R.S. 14:31. In State v. Cancienne, 50 La.Ann. 847, 24 So. 134 (1898), the court stated:
If a husband finds his wife committing adultery, and, provoked by the wrong, instantly takes her life or the adulterer's, * * * the homicide is only manslaughter. 24 So. at 136.
The instant offense was obviously not an immediate response to uncovering a spouse (actually a common-law spouse) in flagrante delicto; thus it is distinguished from the crimes in State v. Cancienne, supra, and State v. Senegal, 107 La. 452, 31 So. 867 (1902), relied on by Massey. The lapse of months rather suggests that Massey's feeling of anger and indignity should have had time to cool. Viewed in light most favorable to the prosecution, the evidence supports a rational factfinder in concluding that mitigating factors of sudden passion or heat of blood were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986); State v. Ealy, 530 So.2d 1309 (La.App. 2d Cir.1988).
Massey finally claims that provocation was provided when LaSandra pulled down her panties, pinched her "cheek" and taunted him. Strangely, in his recorded confession Massey makes no mention of LaSandra's alleged conduct; the only evidence in support is Massey's own self-serving testimony. Confronted with this inconsistency, the jury was free to draw its own conclusion and disregard the story of the taunting.
Even if LaSandra did indeed ridicule Massey in the manner described, her conduct would not be sufficient to mitigate his liability from second degree murder to manslaughter. It was far milder than the provocative acts held to be mitigating in recent cases such as State v. Lombard, supra, and State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied 508 So. 2d 64, 65 (La.1987). Moreover, "mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter." State v. Conerly, 48 La.Ann. 1561, 21 So. 192 (1897); State v. Daniel, 49 La.Ann. 954, 22 So. 415 (1897); State v. Quinn, 526 So.2d 322 (La. App. 4th Cir.1988); 40 C.J.S. Homicide, § 47. Viewed in light most favorable to the prosecution, the evidence would justify a rational factfinder in concluding either that the victim did not provoke Massey at all, or not sufficiently to deprive an average person of his self control and cool reflection. This assignment does not present reversible error.
We have reviewed the record for errors patent and find none. LSA-C.Cr.P. art. 920.
The conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.