STATE OF LOUISIANA

VERSUS

KENNY ROJAS

NO. 24-KA-171

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-934, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING

December 30, 2024

**TIMOTHY S. MARCEL**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Timothy S. Marcel

**CONVICTIONS AND SENTENCES AFFIRMED**
    **TSM**
    **FHW**
    **JGG**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Waquin
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
KENNY ROJAS
 Lieu T. Vo Clark

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Darren A. Allemand
 Lindsay L. Truhe
 Leo M. Aaron

**MARCEL, J.**

In this appeal, defendant, Kenny Rojas, challenges the sufficiency of the evidence used to convict him of second degree murder. For the following reasons, we affirm defendant's convictions and sentences for second degree murder and obstruction of justice.

## PROCEDURAL BACKGROUND

On June 9, 2022, a Jefferson Parish Grand Jury returned an indictment charging defendant, Kenny Rojas, with second degree murder of "Lizeth Maldonado" in violation of La. R.S. 14:30.1 (count one) and obstruction of justice in violation of La. R.S. 14:130.1 (count two). Defendant was arraigned and pled not guilty. On May 11, 2023, a twelve-person jury found defendant guilty as charged on both counts. Defendant filed a motion for new trial which was denied. On May 16, 2023, the trial court sentenced defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence as to count one, and to forty years imprisonment at hard labor as to count two, with the sentences to be served concurrently. Thereafter, defendant filed an application for post-conviction relief requesting an out-of-time appeal which was granted by the trial court. This appeal followed.

## TRIAL EVIDENCE

Defendant and his wife, Lizeth Maldonado (victim), resided together with their three children in Jefferson Parish, Louisiana. On the afternoon of February 27, 2022, Lizeth Maldonado was shot after an argument with her husband became physical. All three of the children were home at the time.

One of the children, Zoe, witnessed the homicide and testified at trial. She recalled being in the bathroom when she heard her parents arguing in their bedroom. After her brother confirmed their father was home, Zoe approached her parents' bedroom. Through the half-open doorway, she saw her father shoot her

mother. Her mother grabbed her chest, exclaiming "[Y]ou killed me," then fell to the ground. She testified that her father placed the gun in his pants, grabbed his head, and uttered that he had ruined his life. Her father told her to call 9-1-1 then left the residence.

Earlier that day, Zoe recalled, she was helping her mother clean and cook, while her brothers were in their bedroom playing on her mother's phone. Her brother, Brian, came out of his room to give his mother the phone because his father was calling. Zoe testified that her mother asked her father of his whereabouts. With the phone in speaker mode, Zoe heard her father respond that she should not care where he was. Her mother took the phone off speaker, stated that he was probably out drinking. After ending the call, her mother sent defendant a text message, but Zoe did not know what it said. Later, Zoe showered in the hall bathroom to prepare for a planned visit to a trampoline park with her mother and brothers. It was while brushing her teeth after showering that Zoe heard her parents arguing in their bedroom.

In her testimony, Zoe described being closer to her father when she was younger, but she saw him act very violently with her mother. She stated he would mistreat her and hit her out of jealousy, recalling an incident when her father threw a phone at her mother's face and gave her a black eye. Fear of defendant led her mother to routinely sleep with Zoe in her room. Zoe testified that her father installed cameras on the outside of their house. According to Zoe, the cameras provided only a live video feed that her father could view on his phone.

Zoe testified that when the police got to her house after the shooting, she was still in shock and quickly tried to say everything that had happened. She told officers that she was in the shower when she heard a shot and came out as quickly as she could. In her statement, Zoe reported seeing her mother lying on the

ground, and her father pointing the gun at her and screaming at himself. Zoe also gave a statement at the investigations bureau later in the day of the homicide.

Kenny Rojas Jr., son of defendant and the victim, recalled his father coming to the house the morning his mother was killed. He testified to seeing his father cleaning bullets in the kitchen and a gun in the back of his father's pants. During the argument between his parents, he and his brother were in their bedroom. After hearing the gunshot, he went to his parent's bedroom where he saw his mother lying on the ground. He testified that his father "escaped" after 9-1-1 was called.

Sergeant Lee Hardy, second district patrol sergeant of the Jefferson Parish Sheriff's Office (JPSO), was the first officer to respond to a call for service from a young female who stated that her mother had been shot at their home. On arrival, he found two young boys crying in the living room. The boys directed him toward the back bedroom. Upon entering the bedroom, he found Zoe Rojas crying and standing on the far side of the bed. As he approached her, he saw the victim lying on the floor with a large amount of blood around her chest. She was not breathing, and was unresponsive. Zoe told Sergeant Hardy her parents had been arguing. When he asked her who shot her mother, she replied, "My dad." Thereafter, the case was turned over to the JPSO Homicide Division.

Detective Steven Mehrtens with the homicide division of the JPSO joined the other officers at the scene. Present were the deceased and the three children. He was informed by officers that the possible suspect was the children's father, Kenny Rojas (defendant) and that Zoe reported that he fled in a black Toyota Tacoma. A search warrant for the home was secured, the house was searched, and crime scene photographs were taken.

While at the investigations bureau, Zoe gave a brief statement to Detective Quaintance.[1]  In that statement to detectives, she again recalled being in the shower when she heard a shot.  She told detectives that she came out quickly and heard her mother say "he killed me."  When she opened her parents' bedroom door, she saw her father pointing the gun at her mother.  She described the gun that her dad used to shot her mother as a white or silver gun that "rolls" which was interpreted by the detectives to mean that the gun was a revolver.  Based on the information provided by Zoe, the detectives obtained an arrest warrant for defendant.  Zoe also provided a description of her dad's black Toyota Tacoma truck. Defendant turned himself in between 10:00 p.m. and 11:00 p.m., approximately six hours after the shooting. He did not have a gun, his car, or his phone.  Detectives observed no injuries on defendant's body that showed signs of a struggle.  During the investigation, detectives learned from family members that defendant's vehicle was "stashed" at an address in Marrero off of Bourgeois Street.  Detectives obtained a search warrant for the Toyota Tacoma on March 2, 2022.  The truck was photographed and searched.  During the search, detectives found a receipt from Bayou Segnette Park which had defendant's name, his credit card number, the date of February 27, 2022, and time of 4:36 p.m. listed on it.  Also seized from defendant's car was a brown wallet containing defendant's ID and cards in his name.

Testifying at trial was the victim's employer, Luis Rivera.  Mr. Rivera testified that the victim had worked for him for four years and related that defendant had accused him of having an affair with her.  On one occasion, Mr. Rivera recalled, defendant asked him not to give the victim any more work.  On another occasion, defendant invited Mr. Rivera to his house.  When he arrived at defendant's house, Mr. Rivera recounted that defendant was holding a knife.

---

[1] Zoe gave an initial statement to Detective Quaintance who relayed the information to Detective Rumore who was still at the scene at the time. The children were later taken to the Child Advocacy Center for forensic interviews.

Defendant proceeded to tell Mr. Rivera that he suspected his wife of cheating with both his brother in Honduras as well as with Mr. Rivera.

In the months leading up to the homicide, Mr. Rivera recalled defendant calling Mr. Rivera's wife "like every three days" and telling her that Mr. Rivera was cheating on her with the victim. Moreover, Mr. Rivera testified that defendant called and threatened to kill him multiple times. On the day of the homicide, the victim called Mr. Rivera about picking up medicine she received for him from Honduras. Mr. Rivera arrived at her house around 9:00 a.m. to pick up the medicine and drop off her payment for the week. Defendant was not home at the time. Later that afternoon, he learned that the victim had been killed. Mr. Rivera denied having an affair with the victim.

At the trial, defendant testified that his relationship with the victim, his wife, was not good. They fought a lot because she suspected that he had another son. On February 27, 2022, he was at his job, and he had lunch with a coworker. He went home, and the victim was very mad and waiting for him. They started arguing in the living room, and the victim went to the bedroom. Defendant stayed in the living room and spoke with his children.

Defendant recalled walking into the bedroom and the victim was standing by the bed. A gun was on the bed near the victim. Defendant testified that the victim picked the gun up and angrily looked at him crying. She told him to tell her the truth. When defendant asked what she was talking about, the victim pointed the gun at him. Defendant told her to go ahead and shoot him because he knew she wouldn't do it.

According to defendant, the gun was loaded, cocked, and the hammer was pulled back. He stated the victim pointed the gun at him for approximately two minutes while insisting he tell her the truth. Defendant continued to deny the allegations. Then, the victim pointed the gun at her own chest. Defendant then

approached the victim and grabbed her arm. As he attempted to pull the gun away from her body, he heard a "boom" and the gun fell to the floor.

The victim put her hands on her chest, and she started to fall. Defendant held her so she would not fall hard. Defendant testified that he moved her clothes so he could see where she was wounded, and the victim did not respond. He grabbed the gun, stood up, and Zoe opened the door and said, "Dad what happened?" Defendant testified that he told Zoe that it was an accident and to call 9-1-1. Defendant said that he panicked. He took the gun and his keys and went to the park because his sister had told him earlier that his family was going to have a picnic there. He went to the park but did not find his family.

Defendant testified that he parked in a wooded area, got out of his car, and cried for a while. He stated that security came and asked if he was okay, and he said, "Not really." Security told him he could not be there, and as he tried to get on the main road, he almost hit another car. The person in the other car was upset with him, but they left quickly. He assumed the other person left after seeing the gun in the passenger seat of his car. Defendant testified that he grabbed the gun and threw it in the grassy area outside the car. He left the park and drove around for approximately an hour, not knowing what to do. He went to his sister's house and told her he knew it was wrong that he left his house and that he wanted to turn himself into the police. He testified that he left his car at a parking space belonging to his sister's friend because parking was limited at his sister's house. He told "Tatiana" to call the police because she spoke English. When the police arrived, he surrendered.

Defendant denied beating his wife and that Zoe lied about the abuse. He stated he did not think that the victim was having an affair with Mr. Rivera and that he never threatened his life. He asserted that Kenny Jr. lied about seeing him

cleaning bullets and having a gun in his waistband. On the day of the victim's death, his son told him that Mr. Rivera had been at the house earlier.

In addition to the above evidence relating to the circumstances of the shooting and the police investigation, the State presented the expert testimony of Dr. Dana Troxclair, a forensic pathologist. Dr. Troxclair testified that she performed the autopsy of the victim on March 2, 2022. She explained that the victim sustained one perforating gunshot wound, meaning the bullet entered and exited the body. The gunshot entry wound was on her left breast, and the exit wound was on her right lateral back. She indicated that the path of the bullet was front-to-back, left-to-right, and downward. Dr. Troxclair explained that the range of fire was determined to be "tight contact," based on the characteristics of the wound. Dr. Troxclair stated that with this type of wound, searing or burning of the edges is usually observed, as was present in this case. She described the entry wound of the bullet as being "stellate shaped," with pointy edges. The manner of the victim's death was classified as a homicide. Dr. Troxclair testified that the location of the gunshot wound in this case was not typical of a suicide because usually decedents shoot themselves in the middle of the chest. She stated that it was very atypical in a suicide to have someone shoot themselves at the angle of the gunshot wound that was present in this matter.

## LAW and ANALYSIS

In his sole assignment of error, defendant asserts that the evidence was insufficient to convict him of second-degree murder, that his conviction should be reversed, the sentence vacated, and this Court should render a guilty verdict of manslaughter.[2] The State posits that defendant did not meet his burden of proving entitlement to a manslaughter verdict by a preponderance of the evidence. In its

---

[2]Although defendant was also convicted of obstruction of justice, he does not argue the sufficiency of the evidence as to the obstruction of justice conviction.

brief, the State argues that an argument alone does not constitute sufficient provocation to reduce murder to manslaughter.

**Sufficiency of the Evidence**

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1157, *writ denied*, 23-1615 (La. 5/29/24), 385 So.3d 700. The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1233.

**Second Degree Murder**

Defendant asserts that the evidence established that the shooting was committed in the "heat of passion" when he was angry with the victim and in a jealous rage and that he should have been convicted of manslaughter, not second degree murder. Second-degree murder, defined in pertinent part in this case, as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1).

The offense of manslaughter is defined as a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person

of his self-control and cool reflection. La. R.S. 14:31; *State v. Monterroso*, 22-390 (La. App. 5 Cir. 4/26/23), 361 So.3d 1177, 1190, *writ denied*, 23-745 (La. 11/21/23), 373 So.3d 447. Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Instead, they are mitigating factors that may reduce the grade of the offense. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372.

In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So.3d 690, 696, *writ denied*, 20-650 (La. 11/24/20), 305 So.3d 104. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. *Id.* An argument alone does not constitute sufficient provocation to reduce murder to manslaughter. *State v. Bonilla*, 15-529 (La. App. 5 Cir. 2/24/16), 186 So.3d 1242, 1253, *writ denied*, 16-567 (La. 5/2/16), 206 So.3d 881. The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.

In *State v. Massey*, 535 So.2d 1135, 1137 (La. App. 2 Cir. 1988) the defendant was convicted of second degree murder. The defendant argued that the evidence was insufficient to support the jury's verdict, but rather supported the lesser verdict of manslaughter. *Id.* at 1141. The court recognized that Louisiana jurisprudence had recognized adultery as a sudden provocation contemplated by La. R.S. 14:31. *Id.* at 1143 (citing *State v. Cancienne*, 50 La. Ann. 847, 24 So. 134 (1898), 24 So.134, 136 (1898)). However, the court found that in the matter before it, the defendant had caught his wife in the act of adultery over five months before

he killed her. The court found that the defendant's act was not an immediate response to his wife's affair, as it was too remote in time, even when she taunted him before he stabbed her. The court stated that the lapse of months suggested that the defendant's feeling of anger and indignity should have had time to cool. The court found that the mitigating factors of sudden passion or heat of blood were not established by a preponderance of the evidence. *Id.* at 1143.

In the present case, defendant testified that when he arrived home from work on February 27, 2022, the victim was angry with him. He stated that she suspected that he had a child with another woman. According to defendant, he and the victim were arguing. When he followed the victim into the bedroom, she was standing near the bed, and there was a gun on it. According to defendant, the victim pointed the gun at him then pointed it at herself. He stated that he grabbed her arm and put pressure on it so that the gun would come away from her body. He explained that when he pulled the victim's arm, he heard a "boom," and the victim was shot in the chest. At no point during defendant's testimony did he testify that he shot defendant out of sudden passion or provocation. On cross-examination by the State, when asked if he thought the victim was having an affair with Mr. Rivera, defendant stated, "I didn't think of it that way," and accused Mr. Rivera of lying. Defendant also stated that Kenny Jr. lied when he testified that defendant asked him if Mr. Rivera had been there earlier that day.

Defendant also argues that the circumstances leading to the shooting of the victim had been building up over the years. He alleges that the incident that caused his provocation occurred within a very short period of time before the shooting. He points to his testimony that shortly after arriving home, he found out Mr. Rivera had been in his home. Defendant points to the testimony of Zoe and Kenny who stated they heard their parents arguing before the shooting. He also points to Zoe's testimony that defendant held his head in his hands and said he

ruined his life before telling Zoe to call the police. Defendant avers the evidence supports that the shooting was committed while he was extremely angry with the victim in a jealous rage, and therefore, the evidence is insufficient to prove beyond all reasonable doubt that he is guilty of second degree murder.

In in the instant matter, we find that defendant did not prove by a preponderance of the evidence that the mitigatory factors necessary to reduce his conviction to manslaughter were present. The jury heard testimony from Mr. Rivera that defendant thought he was having an affair with the victim and defendant threatened him multiple times. Mr. Rivera denied the affair. There was no definitive proof that an affair actually happened. Even if an affair had occurred, defendant's testimony indicated that he thought his wife was having an affair for quite some time. The record does not establish that defendant's action of shooting his wife was an immediate response to his wife's affair, or that it was borne out of passion. Again, "an argument alone does not constitute sufficient provocation to reduce murder to manslaughter." *Bonilla*, 186 So.3d at 1253.

Furthermore, the jury was presented with manslaughter as a responsive verdict and was given its definition in the jury charges. The jury rejected manslaughter and returned the second degree murder verdict.

Accordingly, in viewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the conviction of second degree murder. We also find defendant failed to carry his burden of proving by a preponderance of the evidence that the mitigating factors necessary to reduce his conviction to manslaughter were present.

**ERRORS PATENT REVIEW**

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals no errors patent that require corrective action.

**DECREE**

For the foregoing reasons, we affirm defendant's convictions and sentences for second degree murder and obstruction of justice.

**CONVICTIONS AND**
**SENTENCES AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 30, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**24-KA-171**

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
LIEU T. VO CLARK (APPELLANT)      DARREN A. ALLEMAND (APPELLEE)      THOMAS J. BUTLER (APPELLEE)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LEO M. AARON (APPELLEE)
DISTRICT ATTORNEY
LINDSAY L. TRUHE (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053