672 So.2d 448 (1996)
STATE of Louisiana, Appellee,
v.
Jonathan S. WILSON, Jr., Appellant.
No. 27889-KA.
Court of Appeal of Louisiana, Second Circuit.
April 8, 1996.
*451 Indigent Defender Office by John M. Lawrence, New Orleans, for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Hugo Holland, Tommy J. Johnson, Assistant District Attorneys, for Appellee.
Before SEXTON, BROWN and GASKINS, JJ.
SEXTON, Judge.
Defendant Jonathan Wilson Jr., was convicted of one count of second degree murder and was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. He now appeals, urging 13 assignments of error. The conviction and sentence are affirmed.

FACTS
On the morning of July 5, 1994, dental supply salesperson Janet Livingood made a delivery to the Brymar Dental Laboratory (a converted private home) at 4009 Thompson Street in Shreveport. While at the lab, she visited for about 20 minutes with Bryan Markaverich and his father, the lab's co-owners. At about 10:30 a.m., Ms. Livingood left the lab and walked to her Chevy Blazer parked behind the house.
About two minutes later, the Markaveriches heard the loud "thud" of a vehicle hitting their building. They went outside and saw the Blazer resting against the back wall of the lab. The two then discovered Ms. Livingood's body slumped over in the driver's seat of the Blazer. The woman had a gunshot wound to the left temple and was bleeding profusely. When paramedics arrived, they pulled Ms. Livingood from her vehicle and administered emergency care. However, due to the severity of the wound, the EMTs were unable to revive the victim. Ms. Livingood died on the parking lot of the dental lab.
Police arrived shortly after the paramedics and began their investigation. They discovered that none of the victim's property was missing. Because no weapon was found in the vehicle, officers suspected that the woman was the victim of a homicide. Neither of the Markaveriches had heard a gunshot; however, their lab was extremely noisy. Therefore, police began to question the lab's neighbors.
The defendant's sister lived next door to the lab at 4005 Thompson Street. At this house, police interviewed three potential witnessesJonathan Wilson, Jr. (the defendant), Marcus Wilson (defendant's brother), and Clifton Butler (about seven years old at the time of the murder). In his initial statement, the defendant told officers that he was in the kitchen when he heard one gunshot and then the sound of someone running through the bushes behind the dental lab.
A Shreveport homicide detective (Detective Alan Johnson) then interviewed the defendant. The defendant told the detective that he had driven himself home from work (at Harrah's Casino) at about 11 a.m. and helped his brother Marcus clean their sister's house. Defendant said that he had gone outside to take out the trash and that, while outside, he heard a shot, dropped the trash, and ran back inside the house. Wilson told the detective that, as he stood by the kitchen window, he watched the Markaveriches helping the victim and heard someone running through the shrubs at the back of the lab.
At this point, the detective began to be suspicious of defendant's account. He had noticed that, although the defendant said he had driven himself home, there was no vehicle in the driveway. Further, the detective saw that the trash in the Wilson's trash can had a weathered look inconsistent with being freshly taken out. The detective also discovered that, standing by the Wilson's kitchen window, he was unable to hear the loud voices of other officers closer to the window than the bushes behind the dental lab. Finally, the detective saw that the defendant was very nervous while giving the statement, although he did not appear to be under the *452 influence of alcohol or drugs. The detective then asked the defendant and his brother to give a formal statement at the police station. They agreed.
As the detective was leaving with the defendant and his brother, he met Bradley Boyles, the boyfriend of Dicie Wilson, the defendant's mother. Boyles, a security guard, told the detective that his .357 Magnum revolver had recently been stolen from the trunk of his car.
At the station, detectives first interviewed Marcus Wilson. Marcus told the officers that the defendant had been laid off from Harrah's about a month before. He said that Jonathan had come to their sister's house at about 9 a.m. on a bicycle. In light of these discrepancies with Jonathan Wilson's story, officers focused their investigation on the defendant. After reading him the Miranda warnings, officers formally interviewed the defendant. He was not under arrest at this time.
Defendant said that he had spent the night at his girlfriend's house and either drove his sister's car or got a ride with a "Danny Ray" to work at Harrah's at about 8 a.m. He said that he worked a couple of hours, or 4 hours, told his boss he was sick, and rode the bus "downtown" where he got his sister's car and went home at about 11 a.m. He said again that he took the trash outside, heard a shot and ran back into the house. Wilson claimed to be wearing the same clothes at the interview (a purple Harrah's shirt and corduroy pants) that he was wearing that morning. Notably, he volunteered that he did not have blood on his clothes.
Defendant's brother and the child gave a different version of events. Both these witnesses said that they heard a pop and then saw the defendant come into the house. Each said that the defendant changed his clothes immediately after coming into the house. Defendant's brother remembered him wearing green shorts when he came into the house and the child remembered the defendant changing from a khaki shirt into a Harrah's shirt. Neither saw the defendant with a gun, although his brother said that the defendant appeared nervous. Defendant's brother also said that the defendant had not used drugs on the day of the murder.
Shortly thereafter, police obtained and executed a search warrant for Wilson's home. They found a .357 Magnum revolver with one fired cartridge, a khaki shirt and a green pair of shorts. They later discovered a cut on the defendant's right hand. Detectives then arrested Wilson for the murder and spoke with him for approximately two hours.
In this extensive interview, defendant gave a number of different versions of events. He began by implicating acquaintances "Mike Dee" and "Tyrone" as the shooters and then gave motive for the killing as either theft or armed robbery of the dental supply store. He said that these two had picked him up at his girlfriend's house between 10 and 11 a.m. and that he had handled their gun. He speculated that the two had shot the woman and then ran away. The defendant said that he had picked up and hidden the gun that they dropped. Police later located these two subjects and both denied any activity with the defendant on the day in question.
Later, after officers asked whether he had been using drugs, Wilson abandoned the accomplice story and indicated that he had such a severe drug problem that he often did not remember what he did. He said that he had been smoking marijuana for days and was "high" at the time of the murder. He then admitted getting the gun from his mother's boyfriend's car. Later, when officers asked him directly if he shot the woman, he answered "I believe" and "probably" but maintained that he was incoherent at the time from the drugs. The defendant concluded the interview by apologizing to the family of the victim; he said "I didn't mean to do it." The officers testified that the defendant did not appear to be under the influence of narcotics at the time of the statement.
The crime lab examined the physical evidence collected by police and determined that human blood was present on the defendant's boxer shorts, pants, shirt and green shorts. The technician found "high-velocity" blood spatter on the defendant's khaki shirt, a pattern which appears only when tissues are subjected to an explosive force such as a *453 gunshot. However, the only blood on the defendant's clothing present in sufficient quantity to be typed was his own, probably from the cut on his hand. Moreover, the gunshot residue (GSR) test on the defendant's hand failed to reveal evidence that he had recently fired a weapon.
Another expert opined that the cut could have been produced by the abrasion of the defendant's hand against the hammer spur of the weapon as he put the gun into the waistband of his pants. He also said that this action could account for the lack of usable fingerprints on the weapon. Further, officers testified that it is not at all unusual for a GSR test to be negative even though someone has recently fired a weapon because that evidence is so fragile and easily destroyed.

DISCUSSION

Assignment of Error Numbers 1 and 2 Gruesome Photos
Defendant complains that state's Exhibits 11 and 52 should have been excluded because they are too gruesome.
Exhibit 11 is a 3" by 5" color autopsy photo of the victim's face in left profile. In the center of the photo is the entrance wound to her temple and the associated tissue damage. There is no blood shown in the photo. The entrance wound itself is mostly dark and difficult to see, but the surrounding skin including the skin surrounding the victim's left eye is either badly burned or bruised. Moreover, the photo shows that the victim's left eye has collapsed, although this area is fairly dark and difficult to see as well. The photo also depicts a number of small injuries to the skin peripheral to the burned area around the wound.
Exhibit 52 is a 3" by 5" color photo of the victim lying on the ground at the crime scene taken by paramedics as they tried in vain to save her life. The entrance wound to the victim's temple is plainly visible; however, there is very little blood around the wound and on the victim's face. The photo also shows that the gunshot wound did great damage to the victim's left eyeit is badly bruised and bulging. The photo does not clearly suggest whether the victim is alive or dead.
The standards by which the admissibility of gruesome photos is tested is long-settled. In State v. Huff, 27,212 (La.App. 2d Cir. 8/23/95), 660 So.2d 529, 535, this court said:
Photographs which illustrate any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible. LCE Art. 401; [State v.] Stokes [26,003 (La.App. 2d Cir. 6/22/94), 639 So.2d 395, writ denied, 94-1880 (La. 11/11/94), 644 So.2d 387]. Autopsy photographs are admissible to corroborate other evidence establishing the cause of death, the manner in which the death occurred, and the location, severity, and number of the wounds. State v. Bourque, 622 So.2d 198 (La.1993); State v. Harvey, 26,613 (La.App. 2d Cir. 1/25/95), 649 So.2d 783.
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. LCE Art. 403. The test for admissibility of gruesome photographs is whether the prejudicial effect of the photographs clearly outweighs their probative value. Bourque, supra; Harvey, supra.

The photos in question were properly admitted into evidence. Both photos depict the relevant mode and manner of the victim's death and the severity of her wounds. The autopsy photo (Exhibit 11) is especially probative because it clearly shows the tiny wounds around the entrance wound (created either by burning gunpowder or the victim's shattered sunglasses) critical to the determination of the distance between the victim and the shooter.
The paramedic photo (Exhibit 52) is particularly probative on the issue of the "cleanliness" of the crime scene, an issue important to the reliability of the forensic evidence. This photo shows the EMTs at the scene of the crime and the severity of the victim's wound close to the time it was inflicted. From it a reasonable observer would be led to believe that the wound would warrant extraordinary medical attention even at the risk of contamination of the crime scene.
*454 Moreover, neither of the photos is so gruesome as to raise a presumptive inference of prejudice to the defendant. The photos are both small5" by 7"in contrast to most of the other crime scene photos which are approximately 8" by 12". Neither of these photos depicts any quantity of blood which reduces the prejudicial effect from the state's use of color film. Further, the pictures are relatively sterile considering the victim was shot in the head with a semi-jacketed hollow point bullet fired from a .357 magnum.
Because the photos were probative of key issues in the case and not particularly gruesome, the trial court did not err in admitting the photos over the defendant's objection.

Assignment of Error Nos. 8 & 9 Firearm Tests
Defendant's assignments of error 8 and 9 both complain that the trial court erred by admitting into evidence the forensic tests of the gun seized at the defendant's home. These tests, done by the crime lab, measure the distances at which the weapon deposits soot and gunpowder after firing. This type of test is potentially relevant to the issue of the distance between the weapon and the victim when the weapon was fired.
On Thursday, March 2, 1995, the district attorney's office requested that the crime lab perform these tests. The crime lab received the pistol on Monday, March 6. The D.A.'s office received the results of the tests on the afternoon of Tuesday, March 7. The evidence at issue was presented at trial on March 8.
When the D.A. moved to introduce the tests into evidence, defense counsel objected on the grounds that the introduction would violate the state's obligation to timely comply with the discovery request of the defense for such tests pursuant to LSA-C.Cr.P. Art. 719 and 729.3 as he had "not received any notice of [the tests]." Upon objection, the D.A. indicated that he had not discussed the results with Richard Beighley, the forensic examiner who conducted the tests, and that he did not know what the results of the tests were, nor what Beighley's testimony would be. Further, he stated that he would know the results of the tests when defense counsel and the jury learned them. On this basis, the court overruled the objection, saying that the D.A. disclosed the evidence as soon as was practical, that an earlier disclosure would not have significantly increased the ability of the defendant to respond, and that neither side knew the results of the tests.
On appeal, defendant urges that the court should have excluded this evidence pursuant to LSA-C.Cr.P. Art. 729.5, which provides (in pertinent part):
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
Defendant argues that the state used the distance tests to "corroborate the existence of high velocity human blood spatter" on the clothing seized from his home the day of the murder and that this use was very prejudicial.
The defense has the right, upon motion, to inspect and copy reports of scientific tests made in connection with the case that are in the possession of the district attorney and intended for use at trial. La.C.Cr.P. Art. 719. However, the state has no obligation to disclose information it does not possess. State v. Powell, 598 So.2d 454 (La. App.2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992). The state has a continuing duty to disclose additional evidence which it discovers or decides to use at trial. LSA-C.Cr.P. Art. 729.3.
The imposition of sanctions is within the discretion of the court and therefore a showing of prejudice by virtue of the court's ruling is necessary before the reversal of a conviction is warranted. State v. Norwood, 396 So.2d 1307 (La.1981). Non-disclosure does not warrant automatic reversal but where the defendant is lulled into misapprehension of the strength of the state's case as *455 a result of non-disclosure, the defendant is entitled to reversal. State v. Strickland, 398 So.2d 1062 (La.1981); State v. Phagans, 412 So.2d 580 (La.1982); State v. Davis, 399 So.2d 1168 (La.1981). The effects of a discovery violation may be remedied by effective cross-examination. Powell, supra.
Dawn Tingle, serology supervisor with the North Louisiana Criminalistic Laboratory, testified as an expert in blood spatter evidence. She said that high velocity blood spatter, like that she found on the defendant's khaki shirt, typically travels about 4 to 6 feet back in the direction of the shooter.
The chief deputy coroner for Caddo Parish, Dr. Brenda Reames, testified about the results of the autopsy performed on the victim. In her opinion, the shot which killed the victim was "distant"i.e., at least two feet awaywhen it was fired. She flatly stated that the area around the entrance wound did not display either soot or stippling (gunpowder burns). She opined that the abrasions apparent in S-11, the photo of the victim's face, were caused by shattered bits of the victim's sunglasses and not by gunpowder.
Richard Beighley, the forensic examiner who conducted the distance tests, explained to the jury how firearms deposit powder residue after firing. Like Dr. Reames, he said that firearms typically produce stippling out to approximately two feet. He then opined that, if the tiny abrasions in S-11 were caused by stippling, the firearm used to kill the victim would have been less than two feet from her head. On cross-examination, he and defense counsel had the following exchange:
Q: And I believe it's your opinion that you felt like the shot was fired six to nine inches
A: Yes, sir.
Q: based on what you consider stippling that was in the photograph of Ms. Livingood; is that correct?
A. Yes, sir.
Q: Was your entire test based on the fact that that stipplingthat was stippling on Ms. Livingood in that photograph?
A: Yes, sir.
Q: You cannot testify that that was actually stippling on the face of Ms. Livingood, can you?
A: No. I did not examine the body personally.
Q: In fact, you based your whole tests on the assumption that it was?
A: Yes, sir.
Q: If a coroner were to tell you, Mr. Beighley, that that was not stippling but actually something else, possibly the sunglasses, then would that alter what you testified to?
A: Yes, it would.
Q: And would that make your test results, or what your opinion would be based on your examination, showing that it would not have been six to nine inches but would have been in excess of two feet?
A: That's correct.
In State v. Powell, supra, defendant Powell argued on appeal that the trial court erred in denying his request to impose sanctions and exclude the testimony of the state's witness, the director of the crime lab tendered as an expert in blood splatter analysis. Powell argued that the state gave him no notice that the witness would be called to testify. The state admitted this fact but indicated that it had only received the results of the test that morning and there was no written report. Both attorneys were allowed to review the evidence, and Powell was denied a continuance. The witness was allowed to testify. This court opined that a similar late disclosure "was, strictly speaking, a discovery violation." Powell, supra at 466. However, we determined that the error was harmless because the evidence in question was unpersuasive and that earlier disclosure would have produced no meaningful benefit to the defense. Further, the court determined that defense counsel "skillfully cross-examined Mr. Herd, with the result that he could not identify Powell as the assailant or the chair piece as the weapon."
In this case, as in Powell, the state's failure to inform defendant of the test results was a discovery violation in the strictest sense. However, we find the violation to be harmless error. Defendant's cross-examination *456 of Mr. Beighley combined with the testimony of the coroner effectively nullifies the evidentiary value of the tests insofar as they bolster Beighley's opinion of how far away the defendant was from the victim when he shot her. He admits that his opinion about this distance was based on the assumption that the marks on the victim's face were stippling; an assumption which was demonstrated to be wrong by the coroner's testimony.
The tests in question failed to make a connection between the weapon found in the defendant's home with the victim and, moreover, failed to show how far away the shooter stood from the victim. Therefore, they did not prejudice the defendant. Finally, defense counsel's skillful cross-examination of the witness nullified any advantage that earlier disclosure might have provided.
Furthermore, the defendant did not seek a continuance which would have eliminated any potential prejudice. State v. Feeback, 414 So.2d 1229 (La.1982); State v. Foster, 26143 (La.App.2d Cir. 12/9/94), 647 So.2d 1224; review denied 95-0548 (La. 6/30/95), 657 So.2d 1026.
Assignments of Error Nos. 8 and 9 do not present reversible error and are without merit. LSA-C.Cr.P. Art. 921.

Assignment of Error Number 3 Motion to Suppress
In this assignment of error, defendant argues that the trial court erred in denying his motion to suppress the pistol seized by police during the search of his residence.
After the initial interview at the police station, officers became convinced that the defendant was lying about his actions on the morning of the murder. They executed an affidavit setting forth the pertinent facts of the defendant's involvement in the crime and obtained a search warrant for 4005 Thompson Street on the basis of this affidavit. As indicated in the facts, the stolen pistol and the defendant's bloody clothing were recovered during the search.
Defendant subsequently filed a motion to suppress the seized evidence on the grounds that the warrant was invalid because 1) it was based on unreliable sources, 2) the defendant's statements were made in violation of Miranda and 3) the defendant's statements were made when he was "mentally incapable due to mental condition and/or intoxication." The motion was denied at a pre-trial hearing.
In brief, the defendant "request[s] [the court] to inspect the affidavit for the order of search ... to determine whether or not the affidavit supports the issuance of the order of search." Specifically, he argues that while the affidavit would amply support the defendant's arrest, it provides "no basis for believing that defendant's clothes nor the pistol used in the homicide could be found in defendant's residence." (Emphasis in original.) Thus, defendant's argument in that regard appears to be that the affidavit provided insufficient probable cause for the issuance of the warrant to search the residence.
Probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has trustworthy information, are sufficient to support a reasonable belief that an offense has been committed or that contraband may be at the place to be searched. State v. Byrd, 568 So.2d 554 (La.1990); State v. Johnson, 408 So.2d 1280 (La.1982). An issuing magistrate must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. The task of the reviewing court is simply to insure that the magistrate had a substantial basis for concluding that probable cause for a search warrant existed. State v. Lingle, 436 So.2d 456 (La.1983). See State v. Davis, 92-1623 (La. 5/23/94), 637 So.2d 1012.
As stated in State v. Poree, 406 So.2d 546, 547 (La.1981) (cited in Davis, supra):
Without direct observation, the appropriate connection [between the sought-after items and the place to be searched] may be manifested by the type of crime, the nature of the items sought, the extent of opportunity for concealment, and normal inferences as to where a criminal would be *457 likely to hide the instrumentalities and fruits of the crime.
The affidavit in this case relates generally the facts of the crime and the highlights of the statements of the defendant and his brother. The defendant's statement is presented to describe the inconsistencies in the stories he told police. The recited portion of the brother's statement indicates that the defendant came into the house, very nervous, four or five minutes after the shooting and immediately changed clothes.
The defendant's inconsistent statements and outright lies raise suspicion that he was connected to the crime. Further, because the affidavit shows that the defendant entered the house shortly after the shooting, it is reasonable to believe that he might have been in possession of the gun when he entered the house. Moreover, the statement from the defendant's brother indicating that the defendant had changed clothes would lead a reasonable person to believe that the clothes were still in the defendant's room. The affidavit, executed on the day of the crime, does not indicate that the defendant had left the house after the crime was committed. This information, taken together, gave the judge a substantial basis to believe adequate probable cause existed to issue the search warrant. Taken in its entirety, the affidavit is sufficient to support the issuance of the search warrant.
This assignment of error is without merit.

Assignment of Error Number 4 Defendant's Statements
In this assignment of error, defendant argues that the "statements" he made to police should not have been admitted into evidence. Because defendant's brief is unclear as to what statement he refers and because the issue of the admissibility of both statements was raised in the defendant's pre-trial motion to suppress, we will address the admissibility of both. Both statements were determined to be admissible by the trial court.
A brief repetition of the pertinent facts leading up to the statement in question is useful. After the defendant gave police conflicting stories at the scene of the crime, officers believed that he should be interviewed "in a more controlled atmosphere where he wouldn't be possibly as confused." The police "asked" the defendant to come to the station for further discussion. He was not a suspect at that time, however, and according to the police, he could have refused to go with them for the formal interview. In this first interview, the defendant was read his Miranda rights and informed that he was under "investigation." (See State's Exhibit 1, the Miranda card, which has the word "arrest" marked through and the word "investigation" written in.)
When the inconsistencies in Jonathan Wilson's statement became obvious, police obtained the search warrant for his sister's house. While procuring the warrant, police discovered that Wilson had an outstanding arrest warrant for attempted armed robbery. Officers then arrested Wilson on this warrant; until this time, police insisted that Wilson was free to leave the station. After the search warrant was executed and the incriminating evidence discovered, detectives returned to the station and placed Wilson under arrest for the homicide. Police then read the defendant his rights (State's Exhibit 3 is the Miranda card for the statement in State's Exhibit 4.)
In his brief to this court, defendant argues that the police took him into custody and to the police station without a warrant or probable cause for arrest and, therefore, his statements while in this illegal custody are inadmissible.
This court has previously confronted and extensively discussed a similar factual situation in State v. Calhoun, 554 So.2d 127 (La. App.2d Cir.1989), writ denied, 558 So.2d 601 (La.1990). In that case, a defendant who voluntarily consented to go to the police station for a formal interview argued that his statement at that interview should be suppressed pursuant to Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
In Dunaway, the Supreme Court reversed the conviction of a defendant who gave an inculpatory statement after being taken into custody without probable cause for arrest. The Calhoun court distinguished Dunaway *458 on the grounds that Calhoun had voluntarily gone to the station to give a statement, that he was under "investigation" not "arrest," and that he was free to leave whenever he wanted to do so.
The defendant's first statement is admissible for the same reasons as the statement in Calhoun. The defendant's Miranda card specifically stated that he was under "investigation" and officers testified that the defendant voluntarily came to the station and was free to leave until the time of his arrest on the outstanding arrest warrant. Because the defendant was not deprived of his freedom when he made the first statement, it was properly admitted.
Further, we distinguish Dunaway from the facts of this case relating to the second statement because when he made this statement, defendant was under arrest on two separate chargesthe outstanding attempted armed robbery arrest warrant and for the homicide in the instant case. At no time did the defendant challenge the validity of the "outstanding" armed robbery warrant. Further, the police had more than sufficient probable cause to arrest the defendant for this murder at the time they took the second statement.
Probable cause to arrest exists when the facts and circumstances within an officer's knowledge and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the accused has committed an offense. State v. Elliot, 407 So.2d 659 (La. 1981); State v. Wilson, 467 So.2d 503 (La. 1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). Probable cause to arrest is not absolute cause, and to determine its existence, courts must examine facts and circumstances within the arresting officer's knowledge in light of the experience of reasonable people, not legal technicians. State v. Billiot, 370 So.2d 539 (La.1979), cert. denied, 444 U.S. 935, 100 S.Ct. 284, 62 L.Ed.2d 194 (1979). State v. Scales, 93-2003 (La. 5/22/95), 655 So.2d 1326.
At the time of Wilson's arrest, the police had many incriminating pieces of evidence against him. The police knew that Wilson had lied about where he had been that morning and what he had been doing at the time of the crime. Wilson was clearly at the scene of the crime when it occurred, and his story about exactly where he was at the time of the murder did not comport with the stories of the other witnesses whose stories were consistent. These other witnesses placed the defendant outsidewhere the murder occurredrather than in the kitchen as he asserted. Most importantly, the police had seized bloody clothes and a recently fired revolver from the defendant's room. This evidence was more than sufficient to justify the officer's belief that Wilson had committed the crime.
Because the defendant was lawfully in custody and properly Mirandized when he gave the second statement, it was properly admitted into evidence. This assignment of error is without merit.

Assignment of Error Number 5
In this assignment of error, defendant complains that the trial court erred in admitting testimony of the results of the distance tests. This issue was briefed and previously discussed in assignments of error 1, 2, 8 and 9 and will not be further addressed.

Assignment of Error Numbers 6 and 7
The defendant has expressly abandoned these assignments of error.

Assignment of Error Numbers 10 and 12 Sgt. Rogers' Testimony
In these assignments of error, defendant argues that the court erred by admitting testimony from Sgt. Mark Rogers (state witness expert in crime scene reconstruction) and the results of tests performed by Sgt. Rogers as crime scene analysis evidence and by admitting the testimony of Sgt. Mark Rogers in evidence regarding high velocity spatter.
Sgt. Rogers, a Shreveport police officer in the crime scene investigations unit, was called as an expert witness in crime scene analysis. The defendant objected to his testimony on the grounds that it would violate the state's obligation to timely comply with discovery. Defense counsel said "[W]e have no results of any tests, do not know what he is going to testify to." The state indicated *459 that the officer was first consulted on Thursday, March 2, 1995, and completed his report on Friday, March 3. The D.A. said that Sgt. Rogers "gave me his conclusions" on Monday, March 6. The testimony was offered at trial on Wednesday, March 8. The D.A. admitted that he "[knew] what [Sgt. Rogers] was going to say" but said that "this is all new evidence to me." He said that he had received the reenactment photos only that morning and had immediately shown them to defense counsel. After the D.A. said that the witness "had nothing new to introduce" and would merely "[pull] all the evidence together which he already had", the court overruled the late discovery objection and allowed the officer to testify. Again, the defendant did not request a continuance.
Rogers, whose credentials are quite impressive, explained the principles behind some of the scientific tests done in this case. He noted that gunshot residue evidence is fragile and could be dislodged off the hands while changing clothes. The officer also gave specific opinions, based on his observations of the evidence, about the position of the killer and the victim during the crime. He indicated that the driver's side door on the victim's truck was partly open and that the killer used his left hand to shoot the victim. He presented 4 "re-enactment" photos depicting the crime scene according to his opinions. State Exhibit Nos. 55, 56, 57 and 58. Defense counsel again used the coroner's testimony to impeach the officer's opinion of the distance between the shooter and the victim.
Defendant's argument on these issues states: "This objection was raised as to the introduction of state Exhibits 55, 56, 57, 58, 60 and briefed in Assignments of Errors Nos. 5, 8, 9, and 11." In Assignment 11 defendant argues that the belated disclosure of this evidence prejudiced the defense because the evidence "created unwarranted surprise."
Our review of the record reveals that most of Rogers' testimony was repetitive of that of other witnesses. In his second formal statement to police, defendant said that he sometimes used his left hand "for writing and stuff like that." Detective Johnson testified to this also. Dawn Tingle indicated that the high-velocity blood spatter was present only on the left-hand side of the shirt seized from defendant's residence. Tingle also gave detailed testimony about how the blood in the victim's truck was deposited. The bulk of Rogers' testimony concerned this evidence. Detective Johnson testified that GSR evidence is fragile and often is not found on the hands of persons who have recently fired a weapon. Sgt. Hall testified that fingerprints are not certain to be present on an item that a person has touched and that they are also fairly easy to destroy.
The only unique portion of Rogers' testimony was his speculation that the cut on the defendant's right hand could have been made by the abrasion of the pistol's hammer spur against his palm as he put the weapon into his pants. Rogers also opined that this action could account for the absence of fingerprints on the weapon and for the presence and location of the defendant's blood found on the clothes seized from his house.
Other witnesses testified that fingerprints are easily ruined by friction or other conditions, so this evidence was no surprise. Further, the defendant was aware of the lab reports indicating blood on his clothes. Detective Muller testified that the defendant had a fresh cut on his hand at the time of his arrest. Therefore, the defendant knew that this fresh cut could be an issue in the trial.
Rogers' opinion was one permissible inference that could be taken from the quantity and location of the evidence of bloodstains on the defendant's clothing. LSA-C.E. Arts. 703, 705(B). However, when Rogers testified, the jury had already heard the crime lab technician testify that she did not know how long ago the defendant's blood was deposited on the clothes seized from his home. Additionally, no witness testified that the defendant's blood or skin had been found on the weapon's hammer.
Thus, the jury was aware of the few facts on which Rogers' opinion was based which importantly, was contradicted by previous state evidence. Moreover, once again, defendant failed to request a continuance. State v. *460 Feeback, supra; State v. Foster, supra. We see no prejudice to the defendant.
This assignment of error is without merit.

Assignment of Error Number 11 Sgt. Rogers' Photos
In this assignment of error, defendant argues that the court erred by admitting state Exhibit Nos. 55, 56, 57, 58 (Sgt. Rogers' re-enactment photographs) into evidence. As noted in the previous assignment, the issue is whether the photos should have been excluded due to the late disclosure and consequent surprise to the defense. Defendant indicates that this assignment should be considered "in connection with Assignments of Error Nos. 8, 9 and 10." He presents no additional argument in brief on this matter.
As noted in Assignment of Error No. 10, the photos were picked up from the developer on the morning of the day that Rogers testified, and the defense had an opportunity to examine them before the court recessed for lunch. The photos depicted Rogers' opinion of how the crime occurred based primarily upon the evidence given by Dawn Tingle from the crime lab. The only controversial element depicted in the photos was the distance between the gun and the victim. Rogers' opined that the gun was held from at least 6 to twelve inches from the victim's head. The jury however, had previously heard the testimony of Dr. Reams which indicated that the distance between the shooter and the victim was a distance of greater than two feet due to the fact that the abrasions were made by the victim's sunglasses. The defendant skillfully impeached the witness with the findings and testimony of Dr. Reams, which eliminated any potential prejudice. (State v. Powell, supra.) Therefore, this assignment of error is without merit.

Assignment of Error Number 13 Motion for New Trial
This assignment complains about the denial of the defendant's motion for a new trial.
Defendant first urges, pursuant to LSA-C.Cr.P. Arts. 851(3) and 854, that he has discovered two potential witnesses to the crime and that their testimony "would change the findings of the jury." The defendant told police about these witnesses, one of whom is named "Mike Dee," in his second formal interview with police. Police located these subjects, and they denied that they knew the defendant. During the trial, police gave their address in open court. The court denied the motion for new trial on the ground that the witnesses were known to the defense before and during the trial and could have been called.
The denial of a motion for a new trial is not subject to appellate review except for errors of law. LSA-C.Cr.P. Art. 858. In light of the recitation of the witnesses' address at trial and no showing that they had left the area, the trial court correctly applied LSA-C.Cr.P. Arts. 851(3) and 854.
The remainder of the defendant's argument is the legal sufficiency of the evidence against him. Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App.2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App.2d Cir.1988).
In his final statement to police, the defendant said "I believe" and "probably" when asked if he had shot the victim. Officers at *461 the scene and the defendant's brother testified that the defendant did not appear to have been under the influence of drugs or alcohol shortly after the crime was committed. Evidence proved that the defendant lied to the police when initially questioned about the crime. The shirt worn by the defendant on the morning of the murder, removed and hidden in haste, had high-velocity blood spatter on the front consistent with the defendant having been within about six feet of a person who had been shot. A revolver with one fired cartridge was found among the defendant's possessions; the bullet which killed the victim was not inconsistent with having been fired from this weapon. Evidence showed that the killer had used his left hand to shoot the victim, and the defendant told police that he was ambidextrous to a degree.
This evidence, when viewed in the light most favorable to the prosecution, is sufficient to establish the defendant's guilt of the murder beyond a reasonable doubt.
This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.