BROWN, Chief Judge.
| defendant, Everett Charles Wills, Jr., was indicted for second degree murder of Carlos Guster, a violation of La. R.S. 14:30.1. A jury found Wills guilty as charged. The mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence was imposed. Wills now appeals his conviction and sentence. His appellate attorney asserts two assignments of error: insufficient evidence of the crime of second degree murder and excessive sentence. In his pro se brief, Wills objects to the state’s use at trial of gruesome photographs and denial of his motion for a speedy trial.. We affirm Wills’ conviction and sentence.

Discussion

In brief, defendant argues that “[T]he homicide in this case was not second degree murder, but manslaughter.” Without question, the evidence showed that on the night of April 18, 2011, defendant shot and killed Carlos Guster.

Sufficiency of the evidence

In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court held that constitutional due process requires reviewing courts to “determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.” Id., 443 U.S. at 318, 99 S.Ct. at 2788-89. In assessing the sufficiency of the evidence under the Jackson standard, a court asks whether, after considering all the evidence in the light most favorable to the verdict, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. The Jackson v. Virginia standard has |2two components. It requires the reviewing court to view the evidence in the light most favorable to upholding the verdict. “This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Id., 443 U.S. at 319, 99 S.Ct. at 2789. Thus, a reviewing court defers to the jury’s credibility and weight determinations. The Jackson v. Virginia standard then requires the reviewing court to determine whether the jury’s verdict is “rational” under the beyond a reasonable doubt *514 standard. The Louisiana legislature has enacted the Jackson standard in La. C. Cr. P. art. 821. This standard is applied in cases involving both direct and circumstantial evidence. State v. Smith, 441 So.2d 739 (La.1983).[1]

Manslaughter

Louisiana R.S. 14:31(A)(1) provides that manslaughter is a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds |sthat the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
For this “heat of passion” rule to be invoked, there must be (1) provocation sufficient to deprive an average person of his self-control and cool reflection; (2) a killing that was committed in a sudden heat of passion-that is, the killing must follow the provocation before there had been a reasonable opportunity for the passion to cool; and (3) a causal connection between the provocation, the passion, and the fatal act. La. R.S. 14:31(A)(1).
 The Louisiana Supreme Court, in State v. Lombard, 486 So.2d 106, 110 (La. 1986), explained the distinction between manslaughter and murder in this way:
[T]he presence of “sudden passion” or “heat of blood” distinguishes manslaughter from murder. The court has stated on several occasions, however, that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. (Citations omitted) (Emphasis added).
In State v. Brooks, 36,855 (La.App.2d Cir.03/05/03), 839 So.2d 1075, 1078, writ denied, 03-0974 (La.11/07/03), 857 So.2d 517, the court explained that:
Provocation is a question of fact to be determined by the trier of fact.... Provocative acts held to rise to the level of mitigating conduct have involved physical threats or actions on the part of the victim. See State v. Lombard, supra, and State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied, 508 So.2d 64 and 65 (La.1987). Moreover, our courts have not derogated from the principle that “mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter.” State v. Massey, 535 So.2d 1135 (La.App. 2d Cir.1988); State v. Conerly, 48 La. Ann. 1561, 21 So. 192 (La.1896).
As stated, heat of passion is a mitigatory factor in the nature of a defense *515 reducing culpability and defendant must show by a preponderance of evidence its applicability. State v. Lombard, supra; State v. Jackson, 34,076 (La.App.2d Cir.12/06/00), 774 So.2d 1046. In deciding whether a defendant subjectively acted in the heat of passion, the jury considers the defendant’s behavior before, during, and after the crime, but it is the defendant’s emotional state at the time of the killing that is of primary importance.

Facts

This shooting occurred on the night of April 18, 2011, around 10:30 p.m. The victim, 26-year-old Carlos Guster, was walking in his neighborhood. Zina Guster, the victim’s mother, testified that Carlos talked out loud to himself. She testified that she was afraid for the victim’s safety and that she sought help from the local coroner’s office regarding what could be done to help her son; she was advised that nothing could be done because he was not physically a danger to anyone or himself. She testified that Carlos would carry a little microphone and sing out loud, that he never had any problems with anyone, and that he did not own a firearm.
On the night of the shooting, Carlos stopped at the home of Aleana Johnson, defendant’s mother, to speak with defendant’s sister, 18-year-old Ellen Johnson. Ellen and her twin sister Emma were at home alone with Emma’s son.
|sEUen testified that the victim had a crush on her, but that she had spurned his advances. Ellen and her twin sister Emma also testified that the victim had previously cursed at them and their mother, but that he had never physically assaulted them and they had never seen him with a weapon. Specifically, Ellen stated that the victim had never threatened her with a gun, and she had never seen him with a gun. Ellen testified that she had observed the victim talking out loud to himself on several occasions, but she had never reported the victim to the police, nor told defendant about his threats. Similarly, Emma testified that her mother had witnessed the victim’s behavior, but that they had never told defendant about the victim’s threats.
Tondra Johnson, the next door neighbor of Aleana Johnson, testified that she saw the victim walking alone around 10:15 p.m., and that he was talking to himself. She stated that she did not see any weapon. She described the victim as walking on the sidewalk in front of her home, when suddenly defendant, who apparently was dropping his mother off at her home, parked his car in the street and called out to the victim. She testified that defendant’s twin sisters were present on their front porch. She heard defendant state “that he wanted to talk to him (the victim),” but there did not appear to be any hostility. She walked into her home and soon heard “popping noises” outside. She and her son Joe went outside and observed defendant standing over the victim. She asked defendant what happened, and defendant stated that the victim had “disrespected his mom’s house.” She saw a gun in defendant’s hands and asked defendant if he was going to | (¡leave the victim in her front yard. Defendant then turned around, picked up the victim, and walked across the street to a vacant lot where he dropped the victim’s body. Defendant then got in his car and drove off.[2] Joe Johnson, the son of Ton-dra Johnson, testified that he observed *516 defendant carrying a body to a vacant lot before he drove away.
Charmaine Williams testified that he saw defendant shoot the victim, that he heard numerous gunshots, that he saw defendant trying to unjam “his gun and then he saw defendant shoot the victim four or five more times while the victim was lying on the ground. He further testified that the girls (presumably the two sisters) were screaming at defendant not to shoot the victim.
Defendant’s mother and two sisters testified that the victim was talking to defendant and threatening harm to the sisters before he jumped behind a tree and started to pull something from his pocket. At that point defendant shot Carlos, who fell to the ground. One sister stated that then “my brother was making sure whatever he was trying to get out of his pocket — I don’t even know what he was trying to get out of his pocket. But my brother, you know, shot him again.” The mother claimed that Carlos told defendant that he was going to f— those b- and then kill everyone. The mother was impeached by her recorded statement to the police. She said to the police that she had gone into the house and did not see the shooting. On cross-examination, she admitted that she did not see the shooting but heard it.
|7Roy Dickerson, a neighbor, did not see the shooting, but heard the shooting and women screaming. He went outside and observed a person carrying another person. Specifically, he stated that he heard the sounds of gunshots “close together” and looked outside and saw someone standing under the street light. The person under the light then fired twice more down to the ground. Dickerson testified that he saw the shooter stoop and pick up a person.
After the shooting, defendant, who was 35 years old, returned to his home. His wife, Teresa Wills, testified that he was sorry about what happened. She testified that she had previously purchased a gun, a Hi-Point .380, for the protection of her and defendant’s family home, but that she had not seen the gun prior to the shooting. The gun was never recovered; however, the holster was recovered from defendant’s car.
A record from Brittain’s Pawn Shop showed that Teresa Yvette Barnes/Wills purchased on February 12, 2009, a Hi-Point .380 caliber pistol and a Cobra .32 caliber derringer. Two live rounds and six spent cartridges were found at the scene. Richard Beighley, a firearms examiner with the North Louisiana Crime Lab, identified all eight cartridges as .380 caliber. He further noted that the two live rounds had damage consistent with the pistol jamming.
Defendant was interviewed by Sgt. Paul Robinson of the Shreveport Police Department. Defendant, after being given the Miranda warnings, agreed to talk. Defendant stated that the victim had been disrespecting his mother and sisters and some type of confrontation ensued. He stated that lathe victim pulled a gun and that defendant took the gun from the victim and shot him. His statement was played to the jury.
Dr. Long Jin, an expert in forensic pathology, performed the autopsy on the victim. He testified that the victim had six gunshot wounds and other injuries to the right back of the neck and the right upper back, which may have resulted in fragmented bullets hitting the ground. Specifically, Dr. Jin testified that most of the bullets’ trajectories were from front to back, left to right and top to bottom. Dr. Jin recovered one projectile. Dr. Jin testified that the cause of the victim’s death was multiple gunshot wounds to the head *517 and neck, torso and right upper arm. Dr. Jin also testified that the wounds were consistent with the victim being shot while down on the ground.

Verdict

There was no question at the trial that defendant fatally shot the victim, Carlos Guster. Defendant concedes that the evidence presented would be a specific intent murder but for the mitigating factors of provocation and heat of passion. This question must be gauged in the light of applicable law and specific facts. The prosecution’s uncontradicted evidence established that defendant shot the unarmed victim not once but six times. Further, defendant’s pistol jammed after the first shot and he then ejected two rounds that had jammed and shot the victim at least five more times as the victim lay on the ground. Following the shooting, Tondra Johnson asked defendant if he was going to leave the body in her yard. Defendant dumped the body in a vacant lot and drove away from the scene. From these uncon-tradicted circumstances, a rational factfin-der readily could 19have rejected the claim of provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation is a question of fact to be determined by the trier of fact. Provocative acts held to rise to the level of mitigating conduct have involved physical threats or actions on the part of the victim. See State v. Lombard, supra. There was no evidence of such acts by the victim. The statements by defendant to the police about taking a gun from the victim and shooting him with it are incredible. We note that defendant did not testify at trial. The testimony of defendant’s mother was impeached. Moreover, our courts have not derogated from the principle that “mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter.” State v. Massey, 535 So.2d 1135, 1143 (La.App. 2d Cir.1988).

Excessive sentence

By his second assignment of error, Wills contends that he was sentenced to life without benefits with no discussion “of who Charles Wills is as a person, what circumstances that led to this tragedy, or what the ultimate impact of this sentence would be for the family he was trying to protect.”
Defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1. This statute requires a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. It is within the legislature’s authority to determine the length of the sentence imposed for crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to | lftbe unconstitutional. State v. Stone, 33,383 (La.App.2d Cir.05/15/00), 758 So.2d 997, writ denied, 00-2145 (La.06/01/01), 793 So.2d 181. The decision to assess mandatory life sentences is within the prerogative of the legislature. State v. Stone, supra. The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been rejected. Id., State v. Davis, 31,711 (La.App.2d Cir.03/31/99), 732 So.2d 612, writ denied, 99-3114 (La.05/05/00), 761 So.2d 539; State v. Ruffins, 32,870 (La.App.2d Cir. 12/10/99), 748 So.2d 614.
To rebut the presumption that the mandatory sentence is constitutional, the defendant must clearly and convincingly show that he is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the *518 offense, and the circumstances of the case. State v. Johnson, 97-1906 (La.03/04/98), 709 So.2d 672.
Defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of this mandatory sentence. Defendant shot the unarmed victim who fell to the ground. Defendant’s gun jammed, he ejected two rounds and then shot the victim several more times as the victim lay on the ground. The victim was a small man with mental problems. This is not one of those exceptional or rare cases. The sentence of life imprisonment without benefit |nof parole, probation, or suspension of sentence in the present case does not shock the sense of justice in light of the crime committed.
Further, the trial court did not err in failing to articulate the factors considered in imposing sentence. Failing to articulate reasons for the sentence as set forth in La. C. Cr. P. art. 894.1 when imposing a mandatory life sentence is not error. In such circumstances, setting forth the factors considered in imposing sentence would be an exercise in futility since the court has no discretion. State v. Stone, supra. Further, defendant did not make such a claim at sentencing. The court in this case did not abuse its discretion by not setting forth its reasons for the sentence. State v. Ruffins, supra.

Pretrial motion in limine regarding autopsy photographs

The standards for the admission of gruesome photos are long settled. State v. Wilson, 27,889 (La.App.2d Cir.04/08/96), 672 So.2d 448, writ denied, 96-1195 (La.10/25/96), 681 So.2d 361. In State v. Huff, 27,212 (La.App.2d Cir.08/23/95), 660 So.2d 529, 535, writ denied, 96-0212 (La.05/01/79), 693 So.2d 754, this court said:
Photographs which illustrate any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible. Autopsy photographs are admissible to corroborate other evidence establishing the cause of death, the manner in which the death occurred, and the location, severity, and number of the wounds.
Although Wills’ motion in limine regarding the victim’s autopsy photographs was not ruled upon by the court, the record reflects that there was no objection made to the introduction of the autopsy photographs. |12Wills’ counsel did not preserve an objection for appeal and ultimately waived this issue.
Nonetheless, the photos in question were relevant because they depict the severity of the victim’s wounds and the relevant mode and manner of the victim’s death. In addition, Wills’ guilty verdict did not depend solely on the pictures, but also upon the testimony of several witnesses who were present in the neighborhood on the night of the shooting and other evidence admitted at trial.

Motion for speedy trial

Defendant filed a pro se motion for a speedy trial and motion to quash in December 2011. La. C. Cr. P. art. 701 provides for the right to a speedy trial and requires that a motion for speedy trial be accompanied by an affidavit by defense counsel certifying that defendant and counsel are prepared to proceed with trial. Defendant’s motion contained no such certification. Defense counsel requested a continuance of the hearing of the pro se motion. Thereafter, in March 2012, the motion for speedy trial was denied. Trial eventually took place in December 2012. In between, a number of defense motions *519 and defendant’s pro se motions were filed. Specifically, these were motions to quash and suppress evidence. In addition, three motions for continuance were filed and granted.
It is well settled that there are two separate and distinct bases for a defendant’s right to a speedy trial: a statutory right granted by La. C. Cr. P. art. 701 and a constitutional right embodied in the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution 11sof 1974. The two are not equivalent. State v. Bradham, 46,985 (La.App.2d Cir.02/29/12), 87 So.3d 200.
Louisiana C. Cr. P. art. 701 provides that the sole remedy for failure to commence trial within the mandated time period is pretrial release without bail. Once a defendant has been convicted, any allegation that La. C. Cr. P. art. 701 has been violated becomes moot. State v. Bradham, supra; State v. Mack, 37,174 (La.App.2d Cir.06/27/03), 850 So.2d 1035, writ denied, 03-2122 (La.01/16/04), 864 So.2d 628.
The constitutional right to a speedy trial is fundamental and is guaranteed to an accused. U.S. Const, amends. VI and XIV; La. Const. Art. I, § 16; Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); State v. Jordan, 35,643 (La.App.2d Cir.04/03/02); 813 So.2d 1123, writ denied, 02-1570 (La.05/30/03), 845 So.2d 1067. The right attaches when an individual becomes an accused, by formal indictment, bill of information, or arrest and actual restraint. State v. Bodley, 394 So.2d 584 (La.1981). Louisiana has adopted the four factors used in Barker v. Wingo, supra, to assess whether a defendant’s speedy trial right has been violated. These factors include: (1) length of delay; (2) the reason for the delay; (3) the defendant’s assertion of his right; (4) and prejudice to the defendant. State v. James, 394 So.2d 1197 (La.1981); State v. Bradham, supra.
Applying the four factors mentioned above, review of the record does not indicate a violation of Wills’ right to a speedy trial. Defendant was indicted in May 2011. The pro se speedy trial motion was filed in December 2011 and denied in March 2012. It did not contain the requisite _J_y certification that defendant and counsel were ready for trial. Numerous motions were thereafter filed, heard and ruled upon by the court. The trial was in December 2012. The delays were primarily extended by matters related to discovery and defense motions, as well as by defendant’s pro se motions. Under the circumstances, the delays were not unreasonable considering the gravity of the offense charged. Furthermore, there is no indication that any delay between the date of indictment and the date of trial was the result of anything other than what the trial court’s docket and calendar permitted. The record does not indicate a bad faith effort on the part of the prosecutor. Defendant has neither alleged nor shown that the delay prejudiced his ability to prepare a defense. After considering the relevant factors as prescribed by the jurisprudence and evaluating all circumstances, we find that defendant was not denied his constitutional rights to a speedy trial.
Defendant’s conviction and sentence are AFFIRMED.

. In Jackson v. Virginia, 443 U.S. at 326, 99 S.Ct. at 2792-93, the court stated, "Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner’s challenge be sustained. That theory the Court has rejected in the past. Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in Winship, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.”

. Upon refreshing her memory, she stated that defendant went to his truck and parked in the street and returned to get the body.